Argued and submitted December 23, 1981, affirmed in part; reversed in part and remanded August 4, reconsideration denied September 16, petition for review denied October 19, 1982 (293 Or 653)

HERITAGE SQUARE DEVELOPMENT CO. et al,
*Respondents - Cross-Appellants,*
*v.*
CITY OF SANDY,
*Appellant - Cross-Respondent.*

(No. 79-12-199, CA A20092)

DECKER,
*Respondent - Cross-Appellant,*
*v.*
CITY OF SANDY,
*Appellant - Cross-Respondent.*

(No. 79-12-168, CA A20092)

BOLSTER et al,
*Respondents - Cross-Appellants,*
*v.*
CITY OF SANDY,
*Appellant - Cross-Respondent.*

(No. 79-12-47, CA A20092)

648 P2d 1317

Paul R. Romain, Portland, argued the cause for appellant - cross-respondent. With him on the briefs were Richard D. Roberts, James L. Dumas and Ragen, Roberts, O'Scannlain, Robertson & Neill, Portland.

Paul D. Schultz, Oregon City, argued the cause for respondents - cross-appellants Heritage Square Development Company, Ltd., and Georgia Shaffer. With him on the brief was Hibbard, Caldwell, Canning, Bowerman & Schultz, Oregon City.

John C. Anicker, Jr., Oregon City, argued the cause and filed the brief for respondent - cross-appellant Warren Decker.

Carl F. Jepsen, Gresham, argued the cause for respondents - cross-appellants Arthur W. Bolster, Daisy A. Bolster, Wallace Scales and Harriet Scales, dba Bolster-Scales Company. On the brief were James R. Jennings, and Young, Freeman & Jennings, Gresham.

Before Buttler, Presiding Judge, and Warden and Warren, Judges.

WARREN, J.

## WARREN, J.

This is an appeal from a writ of review proceeding in which the trial court declared void a special assessment and remanded for reassessment. We affirm in part, reverse in part and remand.

### FACTS

We summarize the trial court's findings of fact as supplemented by the parties.

In March, 1976, property owners, including respondents, petitioned the Sandy City Council to construct a 106-space municipal parking lot through a local improvement district (LID). The process for the city proceeding on such petitions is set out in Chapter 12.04 of the Sandy City Code.[1] Pursuant to the Code, the City Engineer was requested to submit a written report.

---

[1] The sections of that chapter relevant here include:

"12.04.010 Initiation of proceedings.

"Whenever the city council shall deem it necessary, upon its own motion or upon the petition of the owners of at least sixty percent of the property to benefit specifically from the improvement, to construct, alter, repair, improve, widen or extend any street, alley, sidewalk, parking, curbing or any part thereof, or to construct, alter or install street lights, or to construct, improve or repair any sanitary or storm sewer or water line or any part thereof, or to acquire, establish, construct or reconstruct any off-street motor vehicle parking facility, or to construct, reconstruct, repair or equip a park, playground or other recreational facility, for which it is anticipated that special assessments will be levied, it shall by motion direct the city engineer or engineer retained by the city to make an investigation of such project and to submit a written report with the city administration. Such report shall contain the following:

"A. A map or plat showing the general nature, location and extent of the proposed improvement and the land to be assessed for the payment of any part of the cost thereof;

"B. Preliminary plans, specifications and estimates of the work to be done; provided, however, that where the proposed project is to be carried out in cooperation with any other governmental agency, the engineer may adopt the plans, specifications and estimates of such agency;

"C. An estimate of the probable cost of the improvement, including any legal, administrative and engineering costs attributable thereto;

"D. An estimate of the unit cost of the improvement to the specially benefited properties;

"E. A recommendation as to the method of assessment to be used to arrive at a fair apportionment of the whole or any portion of the cost of the improvement to the properties specially benefited;

"F. The description and assessed value of each lot, parcel of land, or portion thereof, to be specially benefited by the improvement, with the names of the owners or reputed owners thereof and, when readily available, the names of the contract purchasers thereof;

"G. A statement of outstanding assessments against property to be assessed."

"12.04.030 Resolution and notice of hearing.

"After the city council has approved the engineer's report as submitted or modified, the council shall, by resolution, declare its intention to make such improvements, provide the manner and method of carrying out the improvement and shall direct the city recorder to give notice of such improvements by posting *at the city hall and at two places within the benefited area*, and by mailing copies of such notice to the owners to be assessed for the costs of such improvement. Said notice shall contain the following:

"A. A statement describing the proposed improvement, the area to be served, and the intention of the council to make such an improvement;

"B. That the engineer's report is on file at city hall and may be examined during normal business hours, or other specified times;

"C. That the council will hold a public hearing on the proposed improvement on a specified date, which shall not be earlier than ten days following the mailing of notices, at which time objections and remonstrances to such improvement will be heard by the council;

"D. The estimated total cost of the project or the cost of that portion of the project to be financed by assessments to benefitting properties."

"12.04.040 Hearing and action on improvement.

"If, prior to or during the hearing, written objections are received from owners, representing two-thirds of the area to be assessed, the improvement proceedings shall be abandoned and shall not be subject to a further hearing for at least three months. The council, after receiving objections from owners representing not more than two-thirds of the area to be assessed may adopt or amend the engineer's report, and adopt the same by resolution. Having by resolution created a local improvement district, the council shall direct the city engineer or an engineer retained by the city to prepare detailed plans, specifications and cost estimates for the proposed improvement."

"12.04.060 Call for bids.

"The city council, in its discretion, may direct the city manager to call for bids for construction of all, or any part of the improvement project on the basis of the council-approved engineer's report at any time after passage of said improvement authorizing resolution and the contracts shall be let to the lowest responsible bidder, provided that the city council shall have the right to reject all bids when they are deemed unreasonable or unsatisfactory. Said contracts shall provide for the bonding of all contractors for the faithful performance of any contract let under its authority, and the provisions thereof in case of default shall be enforced by action in the name of the city.

"*If the council finds, upon opening bids for the work of such improvement, that the lowest responsible bid is fifteen percent in excess of the engineer's estimate, it shall provide for holding a hearing of objections to proceeding with the improvement on the basis of such bid, and it shall direct the city recorder to publish one notice thereof in a newspaper of*

The engineer's report was made and approved by the Council on April 19, 1976. The report did not detail plans and specifications but simply listed certain general work with estimated costs. It did not list the cost of property acquisition, appraisal fees, lighting costs, water line and hydrant costs, utilities installation costs or attorney fees. The total cost estimate was $57,565.00. The report did not set forth a description and assessed value of property to be assessed.

The Council set a remonstrance hearing for May 17, 1976, and gave notice of the hearing to property owners to be assessed. Remonstrances at that hearing were only slightly greater than 20 percent of owners affected. A resolution was passed creating LID-4 and directing the engineer to prepare detailed plans and specifications and costs.

By October 1, 1976, when the Council had a regular meeting, certain problems had arisen, and some property owners were concerned as to why the project had not progressed. In executive session held after that meeting, the Council decided to divide the project into two separate phases. Minutes of the Council meeting on November 1, 1976, disclose that Phase I of the project had been approved in executive session and would be up for approval before the Council. This meeting was adjourned until November 4, 1976. Notices to property owners to be assessed, under date of November 2, 1976, were sent by registered mail. The notice indicated that the business before the Council would be that of making a final decision on the improvement to resolve problems so that bids could be let on Phase I of LID-4. The notice did not say that Phase I allowed for only 57 parking spaces, compared to the 106 spaces proposed under the original project. No reference was made in the notice to costs or cost increases.

At the November 4, 1976, meeting, various problems were discussed, and no final decision made. A council member noted that there was some misunderstanding

_general circulation in the city._ Notice shall state the purpose, date, time and place of said hearing. After the hearing, the council shall determine whether said bid shall be accepted or rejected." (Emphasis added.)

about costs. It was stated at one point that engineering bids could not be let until the needed property was acquired. The entire cost of Phase I had not yet been determined. The Council wanted to expedite the completion without finally determining certain costs that could have been estimated with some accuracy and that later constituted a major portion of total costs. The final result of that hearing was a motion to authorize the City Manager, City Attorney and City Engineer to proceed to expedite Phase I and Phase II.

No further formal notice of Council hearings was served on the property owners to be assessed.

On January 23, 1977, a bid for construction of Phase I was let in the amount of $38,763.40, conditioned on the City's acquisition of the property. Several Council meetings were held thereafter, during which lighting, landscaping and property-acquisition costs were discussed. No formal notice of these meetings was given to property owners assessed. Phase I was subsequently completed.

In June, 1979, notices of assessment were sent to property owners, including respondents. The total assessed cost of Phase I was $104,979.76. This resulted in an increase in respondents' assessments greatly in excess of 115[2] percent of the engineer's original estimate, with the project having been substantially decreased in area available for parking and in access.

Certain properties included in the original plan were not assessed for the improvement by the City on the Council's finding that they were not benefited, because the properties were either not contiguous to the parking lot or were served by other existing parking areas and because in some instances, the use of the property did not require parking space.[3]

Respondents Heritage Square Development Co., Georgia Shaffer and Warren Decker on several occasions urged the Council to proceed with the improvement, having knowledge of the proposal to proceed only with Phase I and of the problems involved but not of the great increase in

---

[2] See emphasized language of footnote 1.

[3] The properties benefited were required by ordinance to provide off-street parking for the businesses located thereon.

costs over the engineer's original estimate. Respondents Bolster and Scales did approve of the proposal to split the project into Phase I and Phase II but were without knowledge of the large increase in costs over the engineer's original estimate plus 15 percent.

## REASSESSMENT

Appellant fails to make any assignments of error but proceeds directly to argument. The scope of our review of writs of review is "as from a judgment of a circuit court in an action." Assignments of error are required. Former ORAP 7.19; 7.20. ORS 34.100. This is not an equity appeal; because respondents' cross-appeals do assign errors that require consideration of issues raised in appellant's arguments, we will consider the arguments.

As framed by the arguments and cross-appellants' assignments of error, the questions for resolution are (1) whether the matter was properly remanded for reassessment after the assessments were declared void; (2) whether the trial court can limit the amount of cost that is subject to reassessment and, if so, how; and (3) whether substantial evidence supported excluding three properties from the assessment and how that exclusion affects reassessment.

Because we conclude that the matter must be remanded to the City Council for a remonstrance hearing on the issue of creating the LID, we need not reach the other issues.

■ ■ The city concedes that the proceedings here were defective and that the matter must be remanded,[4] but only for reassessment. It argues that once past the remonstrance

---

[4] Although the city concedes defects, it argued in its brief that respondents are estopped to raise them, because they did not complain until after they had witnessed completion and attending council meetings. At oral argument, it conceded that respondent Bolster-Scales was probably not estopped in that it bought the property after LID-4 was formed and did not petition for the improvement or have the actual knowledge of defects that other respondents may have had. It also conceded that any respondent who was not estopped could pursue the remand. We conclude that respondent Bolster-Scales is not estopped to raise the defects. *See generally* McQuillin, Law of Municipal Corporations §§ 38.192, 38.193 (3d ed 1970). Further, because we conclude that the defects are jurisdictional as to formation of the LID and the proceedings are therefore void, the remaining respondents are not estopped. *See Johns v. City of Pendleton,* 66 Or 182, 133 P 817, 134 P 312 (1913).

stage in creating an LID, all decisions in making the improvement and assessing its cost are political decisions not subject to defeat by remonstrance. The city is correct that, under its ordinances prescribing LID procedures, the only point at which affected property owners may defeat a council decision is at the formation stage. Sandy Code § 12.04.040. Those owners do have, by statute and ordinance, rights to notice and hearing at later stages, but those later rights to be heard do not carry with them the power to defeat council actions taken at those later stages.

■ If the LID had been properly formed and the defects were only in the proceedings to complete it, it would be a matter of reassessment, even if the defects were jurisdictional. ORS 223.420.[5] Respondents argue, however, that the effect of the city's defective procedures was to deny respondents their right to remonstrate to defeat formation of the LID that differed so radically from that proposed.[6] They contend that remanding for reassessment without opportunity to remonstrate against, and perhaps to defeat the improvement, would allow the city to circumvent ORS 223.420, which provides, in part:

"* * * The reassessment shall not be made in case of any improvement wherein a remonstrance sufficient in law to defeat it has been duly filed prior to the making of the improvement."

The record shows that the city split the LID in two during an executive session. The city held a later meeting to discuss the changes but gave only two days' notice and did not provide for remonstrances. Although the contract

---

[5] ORS 223.420 provides:

"The reassessment when made shall become a charge upon the property upon which it is laid notwithstanding the omission, failure or neglect of any officer, body or person to comply with the provisions of the charter or law connected with or relating to the improvement and original assessment or any previous reassessment, and although the proceedings of the council or the acts of any officer, contractor or other person connected with the improvement or assessment may have been irregular or defective, whether such irregularity or defect was jurisdictional or otherwise. The reassessment shall not be made in case of any improvement wherein a remonstrance sufficient in law to defeat it has been duly filed prior to the making of the improvement."

[6] Although the power to determine whether to make an improvement is strictly legislative, this writ of review challenge to a final assessment properly includes an attack on the preliminary decision to create an LID. *McKenney v. Lake Oswego,* 30 Or App 913, 916-17, 569 P2d 27 (1977), *rev den* 281 Or 1 (1978).

for Phase I was not more than 15 percent over the estimate for the approved LID, it exceeded 115 percent of the cost estimate for the proportion Phase I bore to the approved LID; the city did not hold the hearing required by Sandy Code § 12.04.060. After Phase I was completed, the city abandoned Phase II.

The effect of the city's actions after the LID was approved was to split a unitary LID into two LID's. Each was of a character substantially different in size, cost,[7] and benefit (both as to the parties benefited and as to value). That interested parties had notice, however adequate, and attended a meeting to discuss the ramifications of the split, after the fact and without ability to remonstrate effectively, could not give the city jurisdiction to take that unilateral action. In effect, the city abandoned LID-4 that had been approved and created two others that had not. Although it may have the unilateral, legislative power to abandon an approved LID, it did not have jurisdiction to create a new LID of substantially different character and impact without affording all the rights granted by statute, charter and ordinance attendant to creating an LID, including opportunity to defeat the LID by remonstrating. Thus, not only is the assessment void, but the city's creation of LID-4, Phase I, is void for lack of jurisdiction.

If only the assessment were void, ORS 223.405 to 223.485 would allow the city to avoid the defects in the assessment proceedings and to reassess within constutitional and statutory limits for up to the full cost of the improvement. ORS 223.420 appears to grant the same authority even as to jurisdictional defects "connected with the improvement." *See* n 4, *supra.* But we do not read that statute to mean that the legislature intended to take back with one hand the process it and the city mandated with the other. That statute may be applied to avoid defects that do not affect the taxpayers' substantial rights. Here, however, the rights to notice and hearing and to defeat by remonstrance are substantial rights. *See Hughes v. City of*

---

[7] We need not determine here whether cost exceeding preliminary estimates alone may be sufficient to render the proceedings void. The general rule appears to be that minor deviations as to any aspect of the proceedings, improvement or assessment, which do not prejudice the taxpayer, will be disregarded where there is substantial compliance. McQuillin, Law of Municipal Corporations, §§ 175, 177 (3d ed 1970); *see Duniway v. Portland,* 47 Or 103, 111, 81 P 945 (1905).

*Portland,* 53 Or 370, 390, 100 P 942 (1909). Even if a curative act could avoid jurisdictional defects after the fact, it must do so within constitutional limits, by affording the process due under statute and ordinance.

We read ORS 223.420 to mean that the basis on which the original assessment was declared invalid is not *res judicata* on reassessment.[8] But nothing in that statute guarantees insulation of the reassessment from attack for failure to afford mandated protections a second time. To read it otherwise would be to ascribe to the lawmakers the intent to nullify one legislative objective with another. The objective of affording notice and hearing could be nullified by the objective of allowing cities to recover costs of improvements that benefit taxpayers. That would allow a city to obtain approval to create an LID for a sewer, abandon it and construct instead, and without notice and opportunity to remonstrate, a 50-story building, so long as it assessed only those who were given notice of intent to construct the sewer and who also benefit from the 50-story building. We will not ascribe such inconsistency to the legislature and the Sandy Council. *See Lane County v. Paulus,* 57 Or App 297, 301, 644 P2d 616, *rev den* 293 Or 456 (1982).

We take instruction from an early case in which the issue was whether the defendant city and its officials could reassess, pursuant to the authority in its charter to do so, after jurisdiction not only to assess but to improve was found wanting:

"* * * The giving of notice in the terms described by the excerpts of the organic law under which that municipality operates is a condition precedent which must be observed before the city can acquire jurisdiction to make an improvement. The contention of the defendants would make the acquisition of jurisdiction a condition subsequent. The plain logic of their position is that, notwithstanding the provisions of the charter, they may first decide and afterward hear. * * * The situation is simply one where the water of jurisdiction has run past the mill of opportunity. The time to have asserted the power to reassess was before the right of the taxpayer to be heard on the kind of

---

[8] This codifies the rule in *Thomas v. Portland,* 40 Or 50, 56, 66 P 439 (1901). The only exception in the statute to that rule is that an original remonstrance sufficient to defeat the LID is *res judicata.*

improvement had been ignored and rendered worthless. If jurisdiction had been acquired regularly at the outset, it would have been permissible * * * to return and correct errors in the apportionment of the expense by reassessment. In any case, if the city would retrace its steps for corrective purposes, it must go clear back to where it obtained jurisdiction, to which alone can it tack renewed efforts to tax property. It would have been competent for the legislative power of the town to dispense with all previous notice of intention to install betterments and to empower the council to call upon the taxpayer for the first time after the work was completed, but it has not done so. By failing to give sufficient previous notice and yet persisting in the prosecution of the work, the city has reversed the chronological order of the process enjoined by its charter.

"The case presented by the defendants is one in which they have decided beforehand against the taxpayer in one of the most important particulars of the assessment scheme. Jurisdictional power cannot, like the phoenix, rise from its own ashes, and where the case presented is one in which full compliance with the essentials of jurisdiction cannot be had, repetition of the same [assessment] process will never confer jurisdiction. * * *" *Murray v. LaGrande,* 76 Or 598, 604-05, 149 P 1019 (1915).

The *Murray* court distinguished the LaGrande reassessment provision of "to be made in like manner for the same purpose" from provisions in other cases that legislatively provided a new "formula ignoring even the question of jurisdiction under former proceedings * * *." 76 Or at 603, citing *Thomas v. Portland,* 40 Or 50, 66 P 439 (1901) and *Duniway v. Portland,* 47 Or 103, 81 P 945 (1905). The provisions are not so different. Each type, whether for a new or repeated proceeding, gave notice and hearing rights at least equivalent to those that should have been afforded at the original assessment. The real distinction is that, in *Murray,* the assessment was void, not only for defects in the assessment procedure, but also for lack of jurisdiction to make the improvement.

■ ORS 223.405 to 223.485 provide rights equivalent to those afforded at the original assesment and assume that the city earlier afforded the opportunity to remonstrate and defeat the LID. It is silent as to these facts when the city did not afford that opportunity. We hold that when

reassessment provisions fail to afford substantial rights equivalent to those mandated at each stage of the original proceeding to create an LID and to assess its cost, the city must repeat the process from the point of the first defect that rendered the assessment void: here, the creation of LID-4 Phase I, in effect a new LID, without affording the rights granted by Sandy Code § 12.04.040. If the city wants to reassess for the improvements, it must first comply with its code to form the LID properly.

The decree of the trial court is affirmed insofar as it declared the assessments void and set them aside; it is reversed as to the remand for reassessment; and the matter is remanded for proceedings in accordance with this opinion.